2470 Frank Garcia, XRL United States v. Novartis Corporation at Off Good afternoon. My name is Timothy Cornell and I represent the appellants in this case, Frank Garcia and Allison Kelly. Would you mind pulling it up a little bit? Can you hear me now? May it please the court. This is a case in which the district court concluded that fraud had, quote, probably been committed against the government. The defendants do not rebut this, and in fact they do not even attempt to rebut this. But nevertheless, the district court dismissed the complaints now before us. I'm going to show you that the district court erred in three important ways. First, it erred in dismissing the complaints on the grounds of 9B, even though it had the evidence contained in the complaints that it stated that it sought. Second, it erred in You just said complaints. Do you mean the original complaint or the amended one? Both. But did it have in the original complaint that was before the court, it having denied motion for leave to amend, the information that it said it needed? I thought your argument was that that was supplied in the amended complaint. Right. Let's take a second and define our terms. So we have the 2006 original complaint, which is only 60 pages. We have a 2012 complaint, the Allison Kelly complaint, which was formally lodged. And then we have the October 2012 complaint, which was the proposed amended complaint. Now, my argument is that the Garcia complaint, which was filed in 2006, pre-Twombly, under the Morbel-Axe pleading standards, nevertheless contains sufficient allegations that it should have survived 9B. The Allison Kelly complaint in 2012 that was formally lodged clearly contains evidence. But why doesn't that complaint fall because of the first-to-file rule? The Allison Kelly complaint. So the defendants spent a lot of time on the first-to-file rule, and I do not. And the reason I do not is pretty straightforward. Justice Kagan wrote in an opinion about two years ago that a court must look hard and look hard again before turning a simple case into a complicated one. This is a very simple case. Garcia was a pharmaceutical representative for Genentech. He was the first to file allegations against Genentech. Kelly was a pharmaceutical representative for Novartis. Her claims are against Novartis. She was the first to file her claims against Novartis. They filed the 2006 complaint together. Allison Kelly left the 2006 complaint in 2011. She took her claims with her. At the time she took her claims with her, the court ordered Mr. Garcia to file a new complaint. He couldn't file the new complaint on his own. The False Claims Act does not permit a relator to proceed pro se. He needed to have a lawyer. When he obtained a lawyer, with the government's or with the court's knowledge all along, shortly a few months later in October 2014, he filed the proposed amended complaint, the Garcia, the proposed amended complaint that we're talking about. So we have the Garcia. Let's just keep this straight. We've got the Garcia allegations, Genentech, period. We've got the Allison Kelly allegations, Novartis, period. That should be the end of the analysis. On the first to file. On the first to file. And then, of course, they joined. What they were seeking to do was to join the complaint. So what they were seeking to do was join. And that's not before the court, I would assume. I mean, this is not a motion about consolidation. This is not an argument about consolidation. This is an argument that we have the evidence that we needed to survive 9B. Maybe I missed a step in the Kelly description that you gave. She filed. Yes. It was then dismissed without prejudice, no? You missed a step, yes. Okay. Okay, so complicated procedural history, but it's actually very simple in the facts. So she filed along with Garcia in 2006, right? She withdrew on her own, voluntary withdrawal, so voluntary dismissal without prejudice to refile. She filed again on her own in 2012. That second filing is not her first filing. No, that's right. Well, okay, right. That's why I'm having trouble. Gotcha. That second filing is not her first filing. So it's your question, so why aren't we talking about first? Because those are her allegations. She took them with her into her own complaint. But she filed once, and then she filed them again. Yeah, but she filed once, and then she withdrew. Oh, so she took her claims with her. When she withdrew, were all those allegations stricken from the complaint? That's the problem. They were supposed to be stricken from the complaint. But they weren't. They tried to. But the point is, when she walked in the second time and knocked on the door, sitting inside the door was a complaint that had all the same allegations and only Garcia is a plaintiff. Yes. Oh, okay, so fine. I will concede. I mean, that should not be a problem, too. No, not the same allegations as to Garcia, but not as to Kelly. Kelly has her own allegations. Those are the ones that are in the June 2012 complaint. And you're saying those weren't in the earlier complaint, the 2006 complaint? Her allegations, of course, because it was Kelly, Garcia. Kelly says in the first one the car is black. She withdraws from the case. Right. The complaint then has Garcia as the only plaintiff. Right. It still says the car is black. That's right. She then comes in a few years later and files a complaint that says the car is black. The problem is we're talking about two cars. That's the problem. We have a black car and a white car. The 2006 complaint says there's a black car and there's a white car. The white car alleger leaves the complaint. But the white car allegations stay in the complaint. Well, not legally. I mean, they're there in writing, but legally they're not. You're saying for terms of whether there's a pending claim. Right. They've left. There is no pending. That's right. That's not only my argument. That's case law. I mean, think about this. Forget about the false claims context. Think about this with every other complex case you have. If a plaintiff has allegations and leaves the case, settles, or whatever, those allegations don't remain in the case. But the plaintiffs have the complaints, right? Well, granted. But if the complaint is written so that it depends upon the complainant's allegations, those allegations are not pending. So just give me two. She never filed at all. Just Garcia files in 2006. Okay. That complaint's there. She walks in the door when she filed her second time, and now it's her first time. Is she barred? So that's a very good question. Thank you. If the Garcia complaint in 2006 was just as we see it, right, everything that we see there, and then Kelly walks in and she files her complaint, if we did the first-to-file analysis, then yes, yes. So what's the difference? Well, the difference is Garcia is a Genentech representative. He's a Genentech representative. Kelly is a Novartis representative. Kelly knows about Novartis. Garcia knows about Genentech. He also knows about Novartis from Kelly. From Kelly. But it's in his complaint. It's in his complaint. But it's a notice idea, isn't it? How do you mean? Well, the government gets to know what the claims are against these two companies. It's similar complaints. So the background reasoning behind first-to-file is not notice. It's to prevent latchers on, people piling on in order to pile on. But it's also to make the claim known. Is it not? It is to make the claim known. Okay, yes. So it seems to me even back then, wasn't there an issue? Because the claim was known. The general claim was known at that point. It was known because of Kelly. Because of Kelly it was known. Right, because of Kelly. Does that make a difference? Why would that make a difference? Kelly is the one who brought the allegations. She owns the allegations. But if Garcia filed a complaint that says, here's what happened, and one of the people who told me this is this Novartis representative, Kelly, and that's what the complaint says, Kelly can't walk in later and say, I'm the first to file because there's already somebody who filed it. So who cares if she walked away with her claim as long as the complaint has the There was this set of frauds perpetrated by these two companies. That's not the case that we have, though. Garcia is not saying, I know this because Kelly told me. It's the two of them. So you're saying his complaint, standing alone in 2006, could not have relied on those Novartis allegations. It's as if they're not in the complaint. Could not possibly have. The Novartis allegations include going to lavish dinners with exhibits, with the receipts, with the doctors on the back of them. Garcia wasn't there. We'll have to look at it to answer this. Let me ask about the 9B issue. Yes. When I get the complaint, the Garcia complaint or the 2012 Kelly complaint, and I'm a U.S. attorney charged with investigating the case, if I turn to my investigating agent and say, go get me this false claim, one of these false claims, I want to look at it, what would the agent have done? Where would he have gone? There's no identification of any transaction or even any particular doctor submitting a particular false claim. They'd have to go on the assumption that it's going on somewhere out there and we've got to go look for it. I'm not totally confident that I get your point, but let me try to proceed and you can stop me. Usually I would look at it and say, Dr. Phil Jones filed on October 7th this prescription for this drug for a Medicare patient for the wrong use, and he was told and did so for that reason. Go get me that document and let's interview that doctor. How do I do that with this complaint? In the Allison Kelly complaint, you can look at the allegations about the competitive acquisition program, which was a program that both Genentech and Novartis set up in order to take away the financial risk for the doctors and to provide free service, which was a kickback under the Anti-Kickback Act, free service in the form of administration of forms to Medicaid and Medicare. They provided that service. So any doctor who is signed up to the competitive acquisition program is receiving a kickback. In Exhibit Y to the Allison Kelly complaint, there are listed by name and location six doctors who are members of a competitive acquisition program. In Exhibit W, there is what's called a rapid action report, which lists the doctors, how many vials. So let me pause. So you're saying if you say Dr. Ted Jones was a participant in the competitive acquisition program, that those two facts mean he necessarily, Dr. Jones necessarily submitted false claims? Well, no. The fact that he's a member of the competitive acquisition program means by definition, by definition, that he received a kickback in the form of false services. So that's step one. But that doesn't... I know. Let me get to step two. So step two is Exhibit W, which is the rapid action report, which lists the doctors, lists the doctors with the number of vials that they are submitting for reimbursement from the government. And those six doctors appear in the rapid action report. So, yes. Is that the first Kelly filing or the second one? It's both, actually. Both. Yes. Again, we have to keep our definitions. Let's call the... It's in the Kelly filing and it's in the proposed amended, the 400-page proposed amended complaint. Could you do that? And that's your best evidence of meeting the 9B standard, those two things together, Y and W? The 9B for the complaints that were... That was the best evidence for the complaints that were judged. Could you do that same thing, then, if suppose we were looking just at the 2006 Garcia complaint? It's a bit... So the 2006 Garcia complaint rests on the statements of medical necessity, which were prescriptions that also acted basically as sign-ups for the patient support so that they could receive them. Is there anything in that complaint that identifies doctors who would have received them? The statements of medical necessity? Yes. The statements as exhibits, statements of medical necessity are attached. And so just spell out for me what the... How the allegation works, then, how we read the 2006 Garcia complaint to meet the 9B standard, just in the way you were trying to spell out for us how the Kelly complaint did that. Sure. So it's a form that needs to be filled out for the government. The pharmaceutical representatives were instructed, and our relators actually did, fill out these forms for certain doctors. That's a free service. I had so much more to say. Finish your answer. Can I also just say that in... Can I just add one more? Well, let me answer. So that is a free service kickback. Those forms filled out, provided by the doctor. I can't get there. I can't give you deadbolt certainty that in the 2006 complaint, those went off, but they were filled out. The doctors broke their patient doctor confidentiality in order to give the information to the pharmaceutical representative to fill out. I'd like to say one last thing, if I may, before I go. 20 seconds. I can do this in 20 seconds. The amended, the proposed amended complaint goes one step further than that. It tells the story of Dr. Norrie, who was the leading prescriber of Zolaire. She received a... For that, she received the gift of going to the Bahamas on a lavish trip with her family. She is listed in Exhibit W, both in Kelly, but also in the proposed amended complaint. She is listed as billing Medicaid or Medicare 1,572 vials, billed to Medicaid and Medicare. That is, by definition, she is a receiver of kickbacks and a receiver of government funds. So you now have 1,572 reasons to bring this case back to the district court so we can prosecute it. Thank you. May it please the court, my name is Elliot Peters. I represent Genentech and Roche Holdings, and we represent appellants along with my colleague, Michael Rogoff, who represents Novartis. If it's agreeable to the court, I plan to use ten minutes to address the 9B issue, and Mr. Rogoff will use five minutes to address the first-of-file issue. The district court correctly dismissed the Garcia and Kelly complaints under Rule 9B. The district court did not abuse its discretion. I think it would help if you went right at this Y&W reference to the Kelly complaint regarding the competitive acquisition program and the six doctors who took part in it. We've just received an explanation about why that necessarily identifies specific doctors who all of their orders would have been false claims. The competitive acquisition program allegations do not amount to kickbacks, and they do not connect to any false claim. And if you want to go be as specific as possible, I'll address the argument that was just made. I'd like to address two arguments that were just made. This argument about statements of medical necessity, there was not an accurate statement made about what those are. Those are like prescriptions, and they're submitted to private insurers as well as the government. They're not something which are in indicia of the submission of anything to the government. Those statements of medical necessity go to all insurers. And we heard about this Dr. Norrie at the very end, and Dr. Norrie who really illustrates why the district court was completely correct here, because there you have an allegation of a trip to the Palmas, no time of when that took place. You have this allegation that under the rapid action reports, Dr. Norrie was a prescriber of Zolair. And then you have an allegation that Dr. Norrie was enrolled in the Medicaid program, that Dr. Norrie could prescribe. But there's not a single allegation that there was in fact a prescription that was reimbursed or submitted for reimbursement to a government program. And in fact, looking at this court's language in the Roast case, which talks about factual or... Can I just stop you on that? This is just from the brief. It says, according to an internal report compiled by the defendants and submitted as Exhibit W to the PAC, Dr. Norrie either bought Zolair and submitted claims for reimbursement to Medicare and or Medicaid, or wrote Zolair prescriptions that caused the specialty pharmacies to buy the Zolair and submit claims for reimbursement to Medicare and or Medicaid. And then it says this was 1,542 vials between mid-2005 and mid-2006. That's just total prescriptions regardless of whether... Is that following the trip to the Bahamas? When does the trip to the Bahamas occur? It's not alleged when it... The timing of that trip is nowhere in any of the evidence? It is not alleged. The timing is not alleged. And it's important, and I'm glad you asked that question, Your Honor. The rapid action reports set forth the amount of Zolair prescribed by the doctor, the total amount of Zolair. They don't specify in any way or suggest in any way the amount that, if any, that was for which reimbursement was sought from a federal program. And what I was going to say in reference to the Roast case was it talks about statistical evidence, the factual or statistical evidence. Well, there is some statistical evidence alleged in the complaint here. That's that 12% of the total amount of prescriptions for Zolair involved government reimbursement. Well, that means that 88% of them didn't. So if you're going to consider the statistical evidence and the allegations about Dr. Nouri that were referred to, you have a trip to the Bahamas, you don't know when. You have a doctor that prescribes Zolair who can refer patients to the Medicaid program because that doctor is enrolled in Medicare, in Medicaid, and that's it. You are left to speculate, completely speculate about whether or not. I'm sorry. Maybe it doesn't matter, but just so I understand the factor. The last sentence of the bullet in the brief is that these claims amounted to 1,542 vials between mid-2005 and mid-2006. And the predicate for these claims are claims for reimbursement to Medicare and or Medicaid or Zolair prescriptions that cause specialty pharmacies to buy the Zolair and submit claims for reimbursement to Medicare and or Medicaid. So as I'm reading it, maybe you're saying this isn't what W says. The 1,542 vials are all with respect to Medicare or Medicare claims. That's just not what W says. That's not what W says. I think that's clear of the record, but I need to get a specific site. Because the rapid action reports are total amounts of Zolair prescribed by doctors for a particular time period. So what you're left with is a situation, particularly looking at the 06 Garcia complaint and the 2012 Kelly complaint, which Judge Young addressed with care and precision in his 63-page order. He did go through the allegations that existed, and then he found that there were, Garcia there's really no specificity whatsoever in that complaint. There's nothing that could answer your Honor's question if an AUSA turned to an agent and said, let's go find these claims for reimbursement. And there's no such allegation, specific allegation, in the 2012 Kelly complaint either, which would allow anyone to say, how do we find, you have a list of doctors. What do you make of Judge Young's statement that fraud was probable? I think what he was referring to were the allegations of kickbacks and off-label promotion. That the allegations of fraud in that part of the case were certainly adequate. He used the term probable. But he made very clear in the next sentence in his opinion that there was no allegation that was satisfactory of a false claim, of actually the filing of a false claim with the government, which is of course the necessary component of a false claim. So he was referring to fraud on the private purchasers, is that what you're saying, as opposed to fraud on the government? What I understood that to mean was that there were adequate allegations of kickbacks, under the any kickback statute, which isn't privately actionable, or of off-label promotion. That he wasn't finding fault under 9b with those allegations, but what he was finding fault with were the absence of adequate allegations of the filing of a false claim related to that conduct. How could there be fraud of the first type without the filing of a false claim? Because you would, for example, you could have a doctor who received a trip to the Bahamas, who never prescribed Zolair to any patient where there was a reimbursement by the federal government. There would be fraud in that scenario? Arguably there would be, but it wouldn't be actionable under the False Claims Act. Because there wasn't a purchase from the government? Yes, because there was no false claim. Because it didn't involve a request for reimbursement by the government. Could you go through responding to the Kelley complaint? You said the Genentech-Garcia complaint was just not specific at all, and then you said in general there was nothing in the Kelley complaint that would be setting aside the amended Kelley complaint, but there was nothing in the Kelley complaint. But as I understood what they were suggesting is if you put the two exhibits together, Y and W, you would generate names of doctors who were submitting claims. So where are they wrong on that? Because there's no evidence in Y or W of any actual submission of a claim. There's simply evidence that there were doctors who were enrolled in the Medicaid program who also prescribed Zolair. And you know from the statistical allegation, which is I think they're trying to address the Roast case, by putting in this allegation that there's 12%. But that amounts to the fact that there's 88% of the people who are getting, where there isn't reimbursement from the federal government. So Y and W don't get there. All they show is that there are doctors prescribing Zolair, some of whom were enrolled in the Medicaid program. A lot of those doctors, there's not any allegation of what Your Honor and I were just talking about, that there was some kickback to them, that there was some off-label promotion. That's why, respectfully I believe, that's why the appellants focus on this one doctor, Nori, because they can say well that doctor went to the Bahamas and that doctor was a high prescriber and that doctor was enrolled in the Medicaid program. But even that doesn't get you there, because there's no evidence that that doctor ever actually prescribed Zolair for any patient where there was a federal reimbursement. And the statistical evidence would suggest entirely likely that that never happened. And when you get to the arguments that they make about the proposed amended complaint, given the procedural history of this case with numerous complaints filing, dismissal, delay, not complying with court orders, the passage of time since these appellants were employed by either Genentech or Novartis, which is many years, that Judge Young was well within his discretion in concluding that under the proper legal standard, delay, futility, prejudice, that it was appropriate for him to dismiss these complaints with prejudice. Thank you very much. Good afternoon. May it please the court, my name is Michael Rogoff and I represent Appellee's Novartis Pharmaceuticals Corporation and Novartis Corporation. As my colleague Mr. Peters just explained, the district court properly found that the 2012 complaint by Ms. Kelly failed to satisfy Rule 9B. Wholly apart from Rule 9B though, the 2012 Kelly complaint should have also been dismissed for another reason, the first to file bar of the False Claims Act. And I agree with Mr. Cornell, it is simple. The first to file rule bars a second declined ketamine suit where one, the second suit alleges the same essential facts as the first and two, the first suit is still pending. Those are the only two requirements and they're both satisfied here. First, the relators don't dispute that the 2012 Kelly complaint alleges the same essential facts, the same fraud as the 2006 Garcia complaint. They conceded in their filings below that the suits are virtually identical and do not argue otherwise on appeal except for what I just heard, which is that Ms. Kelly took her allegations with her, which is just not correct. The Garcia complaint stands against both Genentech and Novartis. But second, there's also no dispute that the 2006 Garcia complaint was pending when Ms. Kelly filed her 2012 suit and more importantly, unlike the situation that the Supreme Court faced in KBR versus Carter or this court in Gadbois, the first filed action here, Mr. Garcia's 2006 suit, remains pending today while the dismissal is being appealed. Because both of those requirements are met, relators argue something else. They argue and Judge Young found that because Ms. Kelly had filed suit along with Mr. Garcia, she should be completely exempt from the first to file bar. The relators are wrong. It's well established that the first to file rule bars a later derivative key temp complaint by anyone other than the government. The fact that Ms. Kelly was a relator in 2006 before she later asked to drop out of that suit is irrelevant. As described in our appellate brief, courts have consistently held that a relator's earlier filed key temp complaint bars that same relator's later filed complaint. And that makes sense because those decisions honor the plain text of the statute. This court, for example, in Wilson and Duxbury, made clear that the first to file bar is exception free. And the D.C. Circuit Court and other courts have stated when the first to file rule says no person may bring a related action, that language is unequivocal and absolute. Just outside the context of first to file, if two plaintiffs file a complaint and it has allegations of amalgamation, there's A's claims and allegations and there's B's allegations. B then withdraws and walks away. The complaint is not reformulated. Can A win on the strength of what's in that complaint that pertains only to B? Well, if A could use authentic and admissible evidence to prove those allegations, but more importantly, Your Honor, those allegations place the government on notice about the fraud and would bar a second relator. Right. No, I understand that there's the notice. I'm trying to figure out the pending part. I'm just trying to figure out whether the B allegations are still pending. How are we supposed to think that through? They are. I want to know why. I'll explain. When Ms. Kelly asked to voluntarily pull herself out of the 2006 case, Mr. Garcia was ordered not to pull her allegations out of it, but to just get rid of her name. She didn't want her name in the suit. He never complied with that. He never filed an amended complaint. Instead, those allegations against both Judentech and Novartis remain. Ms. Kelly didn't pull her allegations. And he could win on those, I guess, straight up is the idea. He could win on the whole thing. He could if he had evidence that would get by 9B and ultimately some rejection. And is that because under the FCA he's allowed to basically plead her allegations? In a typical case, that's not really usually the case. Well, when you look at the complaint, it's not as disconnected as Mr. Cornell would suggest. They were sales reps who knew one another. They went to meetings together. So conceivably, Mr. Garcia was present during alleged fraud with respect to not only Judentech but also Novartis. They don't belong to one another vis-à-vis the two defendants. If I could just finish. 20 seconds. Thank you, Judge. The same 20 seconds. In fact, a literal reading of no person is completely consistent with the Supreme Court's literal reading last year in KBR v. Carter of the word pending in the very same first-to-file sense. If pending means what Webster's Dictionary says it means, as the Supreme Court concluded, then the words no person in that same sentence should not be interpreted to mean no person other than the relator herself. Otherwise, we rely on the cases and argument in our brief.  Thank you.